JUDGE MARRERO

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

NES FINANCIAL CORP.,

                Plaintiff,

JPMORGAN CHASE BANK,
NATIONAL ASSOCIATION,

                Defendant.

**COMPLAINT**

RECEIVED
MAY 19 2011
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff NES Financial Corp. ("NESF") brings this Complaint against defendant JPMorgan Chase Bank, National Association ("JPMorgan").  Upon knowledge as to its own acts, and upon information and belief as to all other matters, NESF alleges as follows:

### INTRODUCTION

1.      This is a case about misrepresentations made in the course of the sale of a business—specifically, defendant JPMorgan's sale of its Section 1031 tax-deferred exchange business to plaintiff NES Financial Corp.

2.      NESF is an innovative and respected software solutions provider in the trust and escrow industry—a field where high ethical standards and scrupulous compliance with the law are indispensable.  Seeking to cement its reputation as the "gold standard" service provider in that field, NESF purchased JPMorgan's competing 1031 business, J.P. Morgan Property Exchange Inc. ("JPEX").

3.      Unbeknownst to NESF, JPEX had a lengthy history of legal violations that exposed it to billions of dollars of liability.  JPEX's account structures routinely allowed clients to access funds that, under the Tax Code, they were not permitted to access.  In

1

one instance, because a client's accounts were admittedly "not set up as [they] should have been," millions of dollars of segregated funds were illegally swept into client accounts every day. In another instance, JPEX granted a client unrestricted access to segregated accounts and simply relied on the client to ask for permission before accessing the funds—again a plain violation of the Tax Code. JPMorgan was so keenly aware that its account structures could not effectively prevent client access that it rewrote its account agreements to shift liability to the customer for improper withdrawals.

4.      JPEX also faced deeper legal problems.   Because of the broad range of financial services JPMorgan provided, there was a serious risk that JPEX was disqualified from engaging in the 1031 business altogether. JPEX was so concerned about those risks that it hired a consulting firm to seek a private letter ruling from the IRS—but then withdrew its request out of fear that it would get an unfavorable response. The potential consequences of disqualification were even more disastrous and threatened to invalidate JPEX's tax-deferred exchanges.

5.      Despite, or perhaps because of, those potentially massive liabilities, JPMorgan decided to sell JPEX to an unsuspecting buyer. One potential bidder, AST, balked after learning of some of JPEX's legal problems from a member of JPEX's staff. JPMorgan accordingly took a different approach with the next buyer, NESF, and sharply limited access to information about the company. When NESF asked for assurances about JPEX's compliance, JPMorgan responded by making representations and warranties in the purchase agreement that JPMorgan knew were false.

6.      The truth soon emerged when, only weeks after the purchase closed, one client unilaterally withdrew some $40 million from a segregated account. NESF confronted

JPMorgan, but the company refused to do anything—insisting on the one hand that the IRS probably would never pursue anyone for the violations, but then refusing on the other hand to indemnify NESF for any losses in the event it did.

7.      Even apart from saddling NESF with those undisclosed liabilities, JPMorgan failed to honor its contractual commitments.  Despite having promised NESF that it would help transfer clients' accounts to other banks, JPMorgan affirmatively interfered with the transfers.  In one case, a JPMorgan banker went so far as to make false representations to a customer to induce it to stay.  JPMorgan's interference caused substantial delays in the account transfers—and in some cases, caused clients to leave altogether.  As a result, NESF lost millions dollars of revenue that were part of its benefit of the bargain.

8.      In short, while NESF thought it was purchasing a business that would solidify its reputation for quality and trustworthiness, it received a business that saddled it with potentially massive liability.  JPMorgan's wrongful conduct has rendered it impossible for NESF to raise capital from outside investors, undermined NESF's ability to develop new and promising product lines, and driven down the company's value almost tenfold.  NESF accordingly brings this Complaint.

## PARTIES

9.      Plaintiff NES Financial Corp. is a corporation organized under the laws of the State of California, with its principal place of business in San Jose, California.

10.     Defendant JPMorgan Chase Bank, National Association is a national banking association with its designated main office in the State of Ohio.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is diversity of citizenship between the plaintiff and defendant and the amount in controversy exceeds $75,000, exclusive of costs and interest.

12.     This Court has personal jurisdiction over JPMorgan because JPMorgan does substantial business within the State of New York, and because the claims arise out of business that JPMorgan transacted, and tortious acts that JPMorgan committed, within the State of New York.

13.     Venue is proper because JPMorgan resides in this district and because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## HISTORY OF NES FINANCIAL

14.     NES Financial was founded in May 2005 by Michael Halloran, an entrepreneur with extensive experience in the computer industry and a history of establishing successful business ventures.  Halloran created NESF to fill a perceived gap in the escrow and trust management industry—an area that, in 2005, was greatly underserved by a lack of dedicated account-management software platforms.  Halloran created NESF to offer specialized technology solutions to financial services companies operating in sectors where scrupulous compliance with legal requirements was essential.

15.     The first market NESF targeted with its new technology was qualified intermediary services for tax-deferred "like kind exchanges."  Normally, when a taxpayer sells commercial or investment property, it must pay tax on the difference between the property's sale price and its adjusted cost basis.  But under Section 1031 of the Tax Code, 26 U.S.C. § 1031, taxpayers can defer that tax by engaging in a "like kind exchange"—

*i.e.*, using the sale proceeds to purchase other property that is similar in nature. For tax-payers that frequently buy and sell commercial property, Section 1031 offers a means to achieve substantial tax savings by deferring taxes that would otherwise be due upon the sale of the property.

16.     Because of those substantial savings, an industry of third-party service pro-viders has developed to assist taxpayers in Section 1031 exchanges. Under the Tax Code, those entities are known as qualified intermediaries, or "QIs." Qualified intermediaries perform a variety of functions, including holding sale proceeds in a segregated account until replacement property is found and purchased.

17.     In order to preserve an exchange's favorable tax treatment, it is crucial that the qualified intermediary strictly comply with applicable laws and regulations. Among other things, any sale proceeds that the qualified intermediary holds pending the purchase of replacement property must be kept in a segregated account that the taxpayer cannot access without the qualified intermediary's permission. If the taxpayer accesses the funds or the funds are deposited into a taxpayer-owned account, the taxpayer is in "actual receipt" of the funds and any gain is immediately taxable as income.

18.     Even where the taxpayer does not actually receive exchange funds, if the safe-guards on the account are inadequate such that the taxpayer *could* access the funds with-out the qualified intermediary's permission if it chose to do so, the taxpayer is in "con-structive receipt" and any gain is likewise immediately taxable. Moreover, if the entity acting as qualified intermediary is disqualified from doing so under the Tax Code, all the entity's exchanges fail and any gains are immediately taxable. Because of the size of

many taxpayers' 1031 exchange programs, those liabilities can easily add up to hundreds of millions or even billions of dollars.

19.     Because 1031 exchange services require both complex account-management solutions and scrupulous compliance with legal requirements, they presented an excellent fit for NESF's business model.  NESF quickly established itself as an innovator and trusted service provider in the 1031 market by offering software solutions that efficiently monitored and maintained exchange accounts.  NESF set the industry "gold standard" for electronic safeguards that protected the integrity of the exchanges and ensured the benefit of the tax deferral.  NESF is the only qualified intermediary whose processes and technologies have been independently audited for purposes of Sarbanes-Oxley Section 404 compliance and awarded an unqualified SAS 70 Type II certification for five years.  By 2007, NESF had $300 million under management.

20.     Elsewhere, however, the 1031 industry was fraught with corruption.  In March 2008, for example, Edward Okun was indicted for using his company, 1031 Tax Group LLP, to defraud clients out of $132 million in exchange funds.  That same year, Land-America 1031 Exchange Services, Inc., filed for bankruptcy and was named in dozens of lawsuits accusing it of using $330 million of client funds to conduct a Ponzi scheme.

21.     NESF saw in those events an opportunity to solidify its reputation as the market leader for both quality and integrity in the 1031 exchange business.  By doing so, NESF sought not only to maintain its reputation in the 1031 sector, but also to leverage that success into other underserved trust and escrow markets that would likewise benefit from NESF's technology platform, such as EB-5 visa application trusts and client trust accounts in the legal profession.  To succeed in that endeavor, it was crucial that NESF

maintain its impeccable reputation for the highest ethical standards and compliance with the law. It was with those goals in mind that NESF decided to acquire a competing 1031 business owned by defendant JPMorgan—an entity known as JPEX.

## JPEX'S CONCEALED HISTORY OF VIOLATIONS

22.     Michael and David Marcus founded APEX Property Exchange, Inc. in the late 1980s to provide qualified intermediary services for 1031 exchanges. In 2002, JPMorgan acquired APEX's assets from the Marcuses and renamed the business JPEX.

23.     Although to outside observers JPEX appeared to be a well-run and legally compliant 1031 exchange business, the reality was far different. JPEX's operations were riddled with legal violations—including actual receipt, constructive receipt, and disqualification issues—that exposed its customers to billions of dollars of tax liabilities.

### *Actual and Constructive Receipt*

24.     One of JPEX's large clients was Client A. JPEX provided Client A with 1031 exchange services for many years beginning in 1999. As with other clients, Client A's exchange funds were held in accounts at JPMorgan. Due to structural errors in the way Client A's accounts were set up, however, exchange funds were routinely "swept" into other, non-qualified intermediary accounts that were owned by Client A and accessible to Client A.

25.     That account structure was a plain violation of Section 1031 and resulted in actual receipt of exchange funds by Client A on an essentially daily basis. Contemporary notes of JPEX employees confirm that the account was "not set up as it should have been" and show that the qualified intermediary account was improperly sweeping into other, client-owned accounts.

7

26.     Another one of JPEX's largest clients, Client B, also had improper access to exchange funds. Client B's exchange funds were held in depository accounts at JPMorgan and Deutsche Bank. Client B, however, could access those funds without any prior approval from the qualified intermediary through its proprietary treasury system.

27.     As a matter of business practice, Client B usually solicited authorization from JPEX by fax or e-mail before accessing funds. That voluntary approval mechanism, however, failed to comply with Section 1031 because it did not actually restrict Client B from accessing funds. Indeed, on at least one occasion in or around 2007, Client B actually withdrew $4.5 million in exchange funds without approval from JPEX. A Client B employee subsequently contacted a JPEX employee and asked her to backdate a fax authorization for the withdrawal in order to make it appear as though JPEX had authorized the withdrawal. The JPEX employee refused to backdate the authorization and reported the incident to JPEX's in-house counsel, who concurred in her refusal. Thus, not only did Client B's account structure give Client B unrestricted access to all of its exchange funds; Client B actually withdrew such funds on at least one occasion.

28.     As a third example, in or around July 2007, Client C was able to transfer $1300 of exchange-fund interest to his personal account. After initially attempting to access the funds on JPMorgan's website, Client C called a JPMorgan banker and asked to withdraw the funds. In response, JPMorgan transferred the funds to Client C without consulting or seeking JPEX's approval. Once again, this episode both demonstrates the inadequacies of JPEX's safeguards to prevent client access to exchange funds and constituted a specific instance of actual receipt.

29.     In an attempt to prevent clients from accessing exchange funds, JPEX relied on a "red flag" system whereby any employee who accessed an exchange account would be alerted by a "red flag" in the computer systems. That warning system, however, was ineffective and failed to comply with the requirements of Section 1031. Tellers on multiple occasions withdrew funds from exchange accounts without JPEX authorization. On one occasion, a teller at a JPMorgan branch withdrew money for a client from a "red flagged" exchange account merely because the client was a customer of that branch. On another occasion, a teller withdrew funds from a "red flagged" exchange account after typing in the wrong account number.

30.     Beginning in 2001, moreover, JPMorgan used a treasury services system called "TS Link" that permitted clients to modify account authorizations at will. A taxpayer using TS Link could authorize itself to transfer and withdraw exchange funds without qualified intermediary approval.

31.     Finally, in yet another example of deficient controls, JPMorgan counsel Jeremy Dorin redrafted language in JPMorgan's Certificate Regarding Accounts ("CRA") disclaiming JPMorgan's obligation to prohibit clients from unilaterally accessing exchange funds. The CRA was the agreement that JPMorgan had with clients of qualified intermediaries such as JPEX when it acted as depositary for exchange accounts and also provided Internet-based cash management services for the accounts through its "JPMorgan Access" platform. Dorin insisted that the CRA contain language stating that any nominal restrictions on unilateral client access were for the client's "own internal control purposes" only and that JPMorgan would not be liable if clients accessed funds without its permission. Dorin required JPEX to adopt that language over the objections of

JPEX's in-house counsel.  He insisted on that language because he believed that the JPMorgan Access system could not adequately prevent clients from unilaterally accessing exchange funds and believed that the language would shift liability to the client in the event of any improper access.  By expressly acknowledging that clients had unilateral access to the exchange funds, however, the revised CRA language only compounded the problem by confirming that clients were in constructive receipt of the funds.

32.     The examples of actual and constructive receipt catalogued above exposed JPEX's clients to enormous tax liabilities.  Many of JPEX's clients maintained balances of tens or hundreds of millions of dollars; receipts of exchange funds over the life of an account could thus reach well into the billions of dollars.  Clients using JPMorgan's flawed systems thus faced staggering potential tax liabilities.  Those potential taxpayer liabilities translated into similarly substantial liabilities for JPEX itself, which could be held liable for indemnification or negligence in the event that a 1031 exchange failed.

33.     JPMorgan was well aware of those problems at JPEX.  For example, in or about 2003, Elizabeth Lowery, who worked in JPMorgan's Treasury Services division, identified the defect in the Client A account structure and notified JPEX and JPMorgan management.  At a minimum, JPMorgan managers Roger Stone, Gale Inaba, Edwin Rivera, Jason Orben, and Brenton Allen knew that Client A was in actual receipt of exchange funds no later than 2003.  Instead of disclosing the issue to Client A, however, JPMorgan attempted to conceal the problem by reconfiguring Client A's accounts, without Client A's knowledge, as part of a broader restructuring.  Gail Inaba instructed a JPEX employee to implement the structural changes in such a way as to make the retitling of the exchange account "appear logically related to the overhaul."  The restructur-

ing was not completed until 2005, 30 months after the violations were first identified, and JPMorgan never informed Client A of the issue despite the potential for massive tax liabilities.

34.     JPMorgan also knew of many of the other defects in its exchange account controls.  JPEX's in-house counsel told JPMorgan about the problems with Client B's account in 2006.  JPMorgan was informed of Client C's improper access of exchange funds, and JPMorgan itself was named as a defendant in a lawsuit arising out of that episode, which it settled in 2008.  JPMorgan also worked with JPEX to develop the "red flagging" system.  JPMorgan amended its Certificates Regarding Accounts to include liability-shifting language because it knew it could not adequately prevent client access. Finally, JPMorgan internally classified those amended contracts related to 1031 accounts as "risk exceptions," further evidencing its awareness of the foregoing issues.

### Disqualification

35.     In addition to the substantial potential tax liabilities from actual and constructive receipt, JPEX also faced even broader issues concerning its status as a qualified intermediary.  Under Section 1031, the entity acting as a qualified intermediary must be sufficiently independent from the taxpayer.  JPMorgan, however, provided a wide variety of banking and other services to its 1031 clients.  The Department of the Treasury had issued a regulation stating that banks and their related entities could act as qualified intermediaries so long as they did not provide more than "routine financial services" to the taxpayer.  *See* Treas. Reg.1.1031(k)-1(k).  But JPMorgan and JPEX secretly harbored substantial doubts as to whether they qualified for that safe harbor.

36.      JPMorgan and JPEX knew that the risk of disqualification was significant.  In January 2003, for example, a JPEX attorney expressed concerns to JPEX and JPMorgan management about the disqualification issue.  He concluded in an e-mail that, "[i]n some situations, APEX or [JPMorgan] will still be a disqualified person."  Shortly thereafter, he circulated a memo regarding the disqualification issue and stated in his cover email, "The [disqualification] problem is there now."

37.      Certain particularly well-informed prospective clients also expressed concerns about JPEX's potential disqualification.  Some, such as Client D, sought affirmative representations from JPMorgan that it was not disqualified.  Because of their own doubts on the issue, however, JPMorgan and JPEX refused to provide such assurances, and clients declined to engage JPEX as a result.  In a June 2007 presentation to JPMorgan's legal department, JPEX acknowledged that disqualification "continue[d] to be [a]n issue with some key clients" and that "we have lost lucrative deals with large corporate clients that do significant business with [JPMorgan]."  In 2008, JPEX lost an account of one of its largest clients, Client E, after the client's outside counsel advised it to engage a different qualified intermediary due to concerns about JPEX's disqualification.

38.      In late 2002, JPEX hired PricewaterhouseCoopers to prepare a request for a pre-submission meeting with the IRS on behalf of JPEX to address concerns about the scope of the "routine financial services" safe harbor.  JPEX also retained the law firm Skadden, Arps, Slate, Meagher & Flom LLP from approximately 2003 to 2006 to suggest changes to the IRS to clarify the regulation's scope.  Neither initiative was successful, in part due to JPMorgan's and JPEX's concerns about the public awareness of the issue that would necessarily result if the IRS issued guidance and sought comment thereon.

39.        JPEX later retained Deloitte to seek a private letter ruling from the IRS stating that the "routine financial services" safe harbor encompassed all functions that national banks are permitted to perform pursuant to a list issued by the Office of the Comptroller of the Currency ("OCC").   In December 2007, however, JPEX's in-house counsel advised JPMorgan and JPEX not to submit the request as drafted because there was a significant possibility that the IRS would not issue a ruling covering all the various functions on the OCC's list.  A ruling omitting functions that JPMorgan performed could carry the implication that those functions were not "routine financial services."  JPMorgan was directly involved in, and approved the legal expenses for, the foregoing efforts to determine JPEX's status as a qualified intermediary.

40.        JPEX also attempted to address its disqualification concerns by soliciting information from JPMorgan bankers whenever it opened a new account.  JPEX salespeople would e-mail JPMorgan bankers and ask whether JPMorgan provided any "non-routine financial services" for a client.  Although JPMorgan bankers were given no guidance as to what services were "routine," they would respond "no," and JPEX would open the account.  That empty ritual, while confirming JPMorgan's awareness of the seriousness of the disqualified person issue, did nothing to ameliorate the legal risks.

41.        Although well known to JPMorgan and JPEX, the disqualification risks associated with banks acting as qualified intermediaries were not generally known within the 1031 community to qualified intermediaries that were not themselves affiliated with banks.  In particular, NESF was not aware, and could not reasonably have been expected to be aware, that bank intermediaries like JPMorgan harbored serious doubts about their ability to act as qualified intermediaries.

42.        The possibility that JPEX was disqualified from acting as a qualified interme-

diary threatened enormous financial consequences.  If JPEX was disqualified from acting

as qualified intermediary for a client, all its past 1031 exchanges for that client would

fail.  The client would face up to billions of dollars of tax liabilities and could seek to re-

coup those losses from JPEX.

### JPMORGAN SELLS JPEX TO NESF

43.        Despite JPMorgan's knowledge of JPEX's extensive undisclosed liabilities, in

early 2008, JPMorgan decided to put the company up for sale to an unsuspecting buyer.

JPMorgan code-named its sales effort "Project Jewel."

### *Due Diligence*

44.        One potential bidder was American Stock Transfer & Trust Co. ("AST").  In

the course of due diligence, AST was permitted to communicate directly by telephone

with JPEX's controller, who responded to its inquiries.

45.        AST was also permitted to have a direct telephone call with JPEX's in-house

counsel.  During that conversation, AST asked JPEX's in-house counsel what "kept him

up at night."  He responded that JPEX had lost a number of large clients because of the

risk that it was disqualified from acting as a qualified intermediary.  AST's 1031 counsel

was likewise permitted to have a direct telephone call with JPEX's in-house counsel to

discuss the transaction.

46.        Ultimately, AST decided not to purchase JPEX.

47.        JPMorgan also sought to sell JPEX to NESF, which had expressed interest in

purchasing the company a year earlier.  JPMorgan, however, provided NESF with less

access to JPEX employees than it had provided to AST.  For example, NESF was not

permitted to communicate directly by telephone with JPEX's controller and in-house counsel on an ongoing basis. Instead, JPMorgan allowed NESF to meet JPEX employees only for a brief, structured meeting.

48.     Despite those limitations, NESF strived to conduct appropriate due diligence for the transaction. In initial due diligence requests to Chuck Gray, NESF asked for, among other things, a list of "significant outstanding/potential litigation" and "significant losses/mistakes JPEX has made on an exchange."

49.     Despite the obvious potential for claims arising from the actual receipt, constructive receipt, and disqualification issues identified above, in response to NESF's request for a list of "significant outstanding/potential litigation," JPMorgan stated:

> There were two suits that were settled in 2007. Both disputes were with a former shareholder. The first dispute related to the amount of earn-out the shareholder was entitled to on the sale of business to JPMorgan in 2002 and the second dispute related to whether a former employee was constructively terminated triggering certain subsequent payments. We are not aware of any other litigation.

50.     Despite the numerous violations of exchange requirements identified above, in response to NESF's request for a list of "significant losses/mistakes JPEX has made on an exchange," JPMorgan stated: "No significant losses or mistakes to report."

51.     In response to NESF's other due diligence requests, Mr. Gray or other JPMorgan counsel placed various documents in the Project Jewel data room. No document in the data room, however, disclosed any of the above-mentioned issues pertaining to actual receipt, constructive receipt, or disqualification.

52.     JPEX's in-house counsel repeatedly expressed concerns to JPMorgan's deal team about JPMorgan's failure to disclose material facts to NESF. JPMorgan's lawyers

dismissed his concerns and retained total control over the disclosure of information to NESF.

53.     One issue of particular concern to NESF was the source of JPEX's business. NESF was aware of another recent transaction in which a group of investors had purchased a qualified intermediary, Chicago Deferred Exchange Co., from LaSalle Bank. Because that qualified intermediary's clients had primarily been referrals from the bank, the qualified intermediary attracted much less business once it was no longer affiliated with the bank, and accordingly was much less valuable than anticipated.  To ensure that its acquisition of JPEX would not meet a similar fate, NESF sought assurance that JPEX would still be able to attract business on its own, once it was no longer affiliated with JPMorgan.

54.     NESF attempted to broach that issue during a June 26, 2008, meeting in Boston—NESF's only meaningful opportunity to question JPEX employees directly, subject to the supervision of JPMorgan's deal team.  At that meeting, Michael Halloran asked JPEX's National Sales Manager what percentage of JPEX's new clients came from outside referrals as opposed to JPMorgan banking relationships.  Rather than permit the sales manager to answer, a member of JPMorgan's deal team, Kate Gallivan, interrupted to tell NESF that the majority of JPEX's new clients came from outside sources.  Ms. Gallivan failed to disclose that, in reality, the vast majority of JPEX's new clients came from JPMorgan bank referrals, not outside sources.

### *JPMorgan's Representations and Warranties*

55.     JPMorgan responded to many of NESF's other due diligence requests by advising NESF that it would include contractual representations and warranties covering a

specific matter in the purchase agreement in lieu of providing information responsive to the request.  Accordingly, when NESF began negotiating the terms of the Share Purchase Agreement for acquisition of JPEX in August 2008, NESF insisted on a number of contractual representations and warranties designed to address gaps in the information JPMorgan had provided.

56.        In Section 3.7 of the Share Purchase Agreement, JPEX and JPMorgan represented and warranted:

> Except for those liabilities set forth [in] Section 3.7(ii) of the Disclosure Schedule, none of the Companies have any Liabilities or obligations of any nature, whether absolute, accrued, contingent or other and whether due or to become due that would be required to be reflected or reserved against on a balance sheet or related footnotes of the Companies prepared in accordance with GAAP.

Section 3.7(ii) of the Disclosure Schedule lists liabilities as "none."  That representation was false because, as JPMorgan knew, JPEX had a long history of violations involving actual receipt, constructive receipt, and potential disqualification that were material and were required to have been reflected or reserved against on JPEX's balance sheet or related footnotes.  Indeed, JPMorgan had settled the lawsuit arising out of Client C's improper access of exchange funds a mere week before executing the Share Purchase Agreement.

57.        In Section 3.9 of the Share Purchase Agreement, JPEX and JPMorgan represented and warranted:

> To JPMorgan's knowledge, no event has occurred or facts exist that may reasonably give rise to, or would serve as a basis for, commencement of any Action by or against any of the Companies or JPMorgan . . . .

Section 3.9 of the Disclosure Schedule states, "There is no pending or threatened material litigation against any of the Companies."  That representation was false because, as

JPMorgan knew, JPEX had a long history of violations involving actual receipt, constructive receipt, and potential disqualification that presented a reasonable basis for litigation against the company.

58.     In Section 3.10(a) of the Share Purchase Agreement, JPEX and JPMorgan represented and warranted:

> Each of the Companies and JPMorgan . . . have each complied and are in compliance in all material respects with all Laws applicable to them and the Business, and to JPMorgan's knowledge no material violations of Law exist[ ].  To JPMorgan's knowledge, there are no pending investigations or disciplinary proceedings initiated by a Governmental Authority against any of the Companies relating to the Business, and no reasonable basis or bases exists for any threatened investigation or disciplinary proceeding against any of the Companies relating to the Business that could lead to an order or action suspending, restricting, or disqualifying the continued performance of the Business in any material respect.

That representation was false because, as JPMorgan knew, there were substantial questions over its eligibility for the "routine financial services" safe harbor that presented a reasonable basis for threatened investigation or proceedings seeking its disqualification. Indeed, JPEX had lost an account of one of its largest clients, Client E, due to disqualification concerns only a few months earlier.

59.     In order to help ensure the effectiveness of those representations and warranties, Section 8.1 of the Share Purchase Agreement contains a broad indemnification provision.  By that provision, JPMorgan agrees to indemnify NESF

> from and against any and all Liabilities arising out of or caused by, directly or indirectly, . . . any material breach of the representations or warranties made by JPMorgan under this Agreement . . . [and] [a]ny material failure by JPMorgan to satisfy or perform any covenant, agreement or term of this Agreement required to be satisfied or performed by it.

"Liabilities" is defined extraordinarily broadly to include all costs, losses, fees (including attorney's fees), in addition to third party claims whether "known or unknown, absolute

or contingent, liquidated or unliquidated, due or to become due, accrued or not accrued, asserted or unasserted or otherwise."

### *JPMorgan's Agreement To Transfer Client Accounts*

60.     In addition to negotiating contractual representations and warranties designed to protect itself from undisclosed liabilities, NESF negotiated provisions designed to ensure it would capture the economic benefit of its bargain.  In acting as qualified intermediary, NESF earns fees for providing qualified intermediary services, but also earns revenue from the banks that hold its exchange funds, calculated on the basis of an interest rate "spread" on the accounts.  That latter component, in fact, represented approximately 80% of the revenue NESF was earning at the time of the acquisition.  Accordingly, both parties clearly understood, not only that NESF would act as qualified intermediary for JPEX's clients following the sale, but also that JPMorgan would transfer the accounts to which those services related, and for which it formerly acted as escrow or depository, to entities such as Union Bank with which NESF had relationships.  That way, NESF would earn revenue from the interest rate spreads on those accounts and receive the economic benefit for which it bargained.

61.     To that end, Section 5.10 of the Share Purchase Agreement permitted NESF to demand JPMorgan's resignation as agent, holder, or trustee of any escrow or similar account containing JPEX client assets, and required JPMorgan to tender its resignation within five days of any request.  Section 5.10 further required JPMorgan to "provide commercially reasonabl[e] cooperation to Buyer . . . for the transfer of Client Assets to any successor escrow agent" and stated that "JPMorgan will not recommend to the Client a successor escrow agent other than an escrow agent selected by Buyer."

62.      To further ensure the prompt transfer of client accounts, the parties agreed to another cooperation provision in Section 5.2 of the Agreement:

> [E]ach party hereto shall use commercially reasonable efforts to take, or cause to be taken, all actions, and do, or cause to be done, and to assist and cooperate with the other party or parties in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated hereby . . . .

63.      Finally, Section 2.3(e) of the Agreement contains a "true-up" provision that obligated JPMorgan to pay NESF specified spreads ranging from 18.7 to 75 basis points for up to six months during any period in which exchange accounts remained at JPMorgan after the sale.  That provision further reflected the parties' understanding that revenue from the interest rate spread on the exchange accounts was a significant component of the economic benefit for which NESF had bargained.  That provision, however, did not relieve JPMorgan of its obligation to transfer the accounts as soon as commercially reasonable, which remained important because even the maximum 75 basis point spread was far less than what NESF could earn on accounts once they had been transferred to other banks.  After six months, moreover, NESF would earn nothing on any exchange funds still held in accounts at JPMorgan.

### *Execution and Closing*

64.      In reliance on JPMorgan's representations and warranties about JPEX's compliance and absence of liabilities, and in reliance on JPMorgan's promise to assist in the prompt transfer of JPEX's client accounts, NESF agreed to purchase JPEX for $8 million.  NESF financed the purchase with a loan from First Chicago Bank for $12 million, of which $8 million was applied to the purchase price and $4 million was invested as working capital to grow the business.

65.     The Share Purchase Agreement was executed on October 31, 2008, and the transaction closed on November 5, 2008.

## JPMORGAN'S MISREPRESENTATIONS ARE REVEALED

66.     Shortly after the transaction closed, NESF began to learn the truth about JPMorgan's account structures.  In November 2008, NESF noticed that one of its new exchange clients, Client F, had inexplicably withdrawn $40 million in exchange funds without NESF's approval.  Upon investigating, NESF determined that the withdrawal had been authorized by a JPMorgan banker responsible for the account, without any qualified intermediary authorization.  Although JPMorgan reversed the transaction at NESF's request, the episode alerted NESF to potential weaknesses in JPMorgan's exchange systems.

67.     After the Client F incident, NESF investigated JPEX's records to determine whether the failure reflected more systematic and widespread violations.  NESF soon learned that actual and constructive receipt were longstanding and well-documented problems throughout the time JPMorgan had controlled JPEX.

68.     In December 2008, NESF identified the inadequacies of Client B's proprietary treasury system.  In a meeting with Client B in January 2009, Michael Halloran explained to Client B that it was likely in actual receipt of its funds and needed to move its accounts off the JPMorgan platform as quickly as possible.  A Client B representative admitted at this meeting that Client B could and did access exchange funds without qualified intermediary permission.

69.     Former JPEX employees who now worked for NESF later admitted to other violations JPMorgan had failed to disclose.  Several employees acknowledged having

participated in meetings and discussions about Client A's actual receipt of billions of dollars in exchange funds from at least 2002 through 2005.  A former JPEX employee also explained that the same JPMorgan counsel who had negotiated the Share Purchase Agreement had been involved in restructuring the Client A accounts to conceal the violations.

70.     In addition, Kelly Alton, NESF's general counsel, spoke with JPEX's in-house counsel about problems with JPEX's exchanges.  JPEX's in-house counsel revealed his longstanding concerns about, and extensive efforts to resolve, the potential disqualification of JPEX as a qualified intermediary due to JPMorgan's provision of potentially non-routine financial services—concerns that had been disclosed to the other potential bidder, AST, but not to NESF.

71.     Faced with potentially massive liabilities, NESF confronted JPMorgan. JPMorgan responded by contending, among other things, that any liabilities were unlikely to materialize because the IRS was unlikely to pursue the matter.  Despite that claim, when NESF asked JPMorgan to indemnify it against liabilities in the event they did materialize, JPMorgan refused.

72.     NESF also soon became aware that JPMorgan's representations concerning the source of JPEX's business were false.  NESF learned that the overwhelming majority of JPEX's business came from JPMorgan banking referrals, not separate leads by JPEX. Those referrals abruptly stopped after the acquisition.  Former JPEX employees who were now members of NESF's sales team, and who were accustomed to a steady stream of new business from JPMorgan, suddenly found themselves unable to generate new accounts for the business.

**JPMORGAN'S INTERFERENCE AND OTHER CONTRACT BREACHES**

73.      In light of the foregoing developments, it was all the more essential that JPEX's existing clients promptly transfer their accounts to banks with which NESF had relationships so that NESF could receive the benefit of its bargain by earning revenue from the interest rate spreads.  NESF expected that JPMorgan would honor its contractual commitments to provide reasonable assistance by working to help transfer those accounts promptly after the transaction closed.  JPMorgan, however, not only failed to provide such assistance but affirmatively interfered with the account transfers.

74.      For example, one of JPEX's clients at the time of the acquisition was Client G.  Almost immediately after the acquisition, Client G deposited $178 million into a pre-existing exchange account it had opened before the acquisition, making that account one of the largest to which NESF was entitled.  JPMorgan, however, made no effort to transfer that account to NESF.  To the contrary, JPMorgan bankers affirmatively encouraged Client G to leave its money with JPMorgan.  One banker even made express misrepresentations to Client G in an effort to induce the company to stay.  The banker told Client G that, if Client G left its funds with JPMorgan, JPMorgan would maintain them in an account that was both interest-bearing and fully guaranteed under the FDIC's Temporary Liquidity Guarantee Program.  That representation was false because that FDIC guarantee did not apply to that type of interest-bearing account.  Because of JPMorgan's interference, Client G's account was not transferred until March 2009, over four months after the acquisition closed.

75.      JPMorgan also affirmatively interfered with the transfer of another one of JPEX's largest clients, Client B, whose exchange account balances totaled over $100 mil-

lion. As with Client G, JPMorgan did nothing to help transfer Client B's accounts after the closing, and instead affirmatively interfered with the transfer. A JPMorgan banker initially admitted to Client B that JPMorgan had "agreed to help NES facilitate the movement of client bank accounts to other banks." Notwithstanding that promise, the banker later told Client B that JPMorgan would make an exception for Client B and allow the company to "maintain [its] current bank structure" at JPMorgan. Ultimately, due at least in substantial part to JPMorgan's interference, NESF lost Client B as a client entirely.

76.       JPMorgan similarly failed to help transfer other accounts after the closing. Confronted with JPMorgan's intransigence, NESF exercised its right under Section 5.10 of the Share Purchase Agreement to demand that JPMorgan resign as escrow agent or custodian for the accounts. Although Section 5.10(b) required JPMorgan to resign within five days of receiving that demand, JPMorgan delayed doing so and sent out resignation letters on a rolling basis over the course of a month or more. As a result, several of JPEX's largest accounts did not transfer until June or July 2009, over half a year after the transaction closed. Others transferred later still, or not at all.

77.       JPMorgan disregarded its contractual obligations in other respects as well. First, notwithstanding the provisions of Section 2.3(e) obligating it to pay a "true-up" of up to 75 basis points for a maximum of six months for any exchange accounts not transferred, JPMorgan refused to pay the true-up for the $178 million deposited into the Client G account after the JPEX acquisition. JPMorgan's failure to pay that amount violated the Share Purchase Agreement.

78.       In addition, JPMorgan failed to reimburse NESF for a bonus that JPEX had awarded to employee Patrick McCloskey. JPMorgan agreed to reimburse NESF for bo-

nuses paid to employees that were transferred to NESF as part of the acquisition.  Relying

on that promise, NESF paid bonuses to designated employees, including Mr. McCloskey.

Although JPMorgan acknowledged its promise by reimbursing NESF for other bonuses,

it refused to reimburse NESF for the bonus paid to Mr. McCloskey.

### THE HARM TO NESF

79.     Had NESF known the truth about JPEX's undisclosed liabilities and risks, it

would not have agreed to purchase JPEX.  As a result of JPMorgan's misrepresentations,

NESF paid the $8 million purchase price and borrowed and invested an additional $4 mil-

lion in the business that it would not otherwise have expended.  NESF also paid more

than $530,000 in origination fees for the $12 million loan it had obtained from First Chi-

cago to finance the acquisition, incurred more than $340,000 in other professional fees in

connection with the acquisition, and paid more than $1.2 million in interest on the loan.

80.     In addition, NESF lost substantial revenue as a result of JPMorgan's interfer-

ence and other contract breaches.  JPMorgan's interference and delays in transferring the

Client G account cost NESF more than $400,000 in lost revenue.  The loss of Client B as

a client cost NESF more that $1.6 million per year.  JPMorgan's delays in transferring the

other accounts cost NESF more than $2.5 million.  Its failure to pay the Client G true-up

cost NESF $227,000, and the unreimbursed McCloskey bonus cost another $97,000.

81.     Those losses not only resulted in immediate financial harm to NESF, but also

damaged the company in other ways, all of which were reasonably foreseeable to JPMor-

gan.  First, because NESF did not receive the revenue from client accounts it was prom-

ised under the agreement, the company was unable to make a number of scheduled pay-

ments on its $12 million loan from First Chicago.  As a result, NESF has had to pay hun-

dreds of thousands of dollars in penalty interest at a rate nearly triple the ordinary rate on the loan.  NESF has also had to pay First Chicago waiver fees of more than $100,000.

82.      JPMorgan's interference has also gravely harmed NESF's ability to raise additional equity financing from outside investors.  NESF spoke with a number of potential investors following its acquisition of JPEX.  Because JPMorgan refused to honor its commitment to transfer client accounts promptly, however, NESF could not establish the track record of earnings from the combined JPEX/NESF business that equity investors insisted upon as a condition of providing further capital.

83.      That lost revenue also delayed NESF's development and deployment of its other, non-1031 products.  A number of significant projects were held up in the beta stage because NESF lacked the capital to fully deploy them.  By the end of 2010, NESF was approximately twelve months behind schedule in software development due to a lack of financial resources.  Those delays, in turn, prevented NESF from establishing the "proof of concept" of its non-1031 products that equity investors required.

84.      JPMorgan's concealment of JPEX's multibillion-dollar liabilities likewise undermined NESF's ability to obtain equity financing from outside investors.  NESF was potentially required to disclose those liabilities to any equity investor otherwise interested in committing capital to the company.  NESF's investment banker, however, advised that the risk of multibillion-dollar indemnification claims for tax deficiencies would make it impossible for NESF to secure an investment.

85.      NESF's revenue shortfalls, loan default, and inability to obtain financing, all caused by JPMorgan's misrepresentations and contract breaches, have severely impaired the company's value.  NESF's business projections prepared before the acquisition, on

which First Chicago relied in extending financing, supported a valuation for the company of approximately $50 million (calculated at six times EBITDA). The company's most recent round of equity financing prior to the JPEX acquisition similarly valued the company at around $41 million. Because of JPMorgan's misrepresentations and breaches, however, NESF's EBITDA-based valuation has fallen dramatically and now stands at only about $7 million.

## COUNT I: BREACH OF CONTRACT

86.       NESF re-alleges and incorporates herein the allegations in Paragraphs 1-85 above.

87.       NESF and JPMorgan entered into a valid and binding Share Purchase Agreement on October 31, 2008.

88.       NESF paid the contract price of $8 million to JPMorgan on November 5, 2008, and otherwise fully preformed its obligations under the Share Purchase Agreement.

89.       In Section 3.7 of the Share Purchase Agreement, JPMorgan represented and warranted to NESF that JPEX had no "Liabilities or obligations of any nature, whether absolute, accrued, contingent or other and whether due or to become due that would be required to be reflected or reserved against on a balance sheet or related footnotes of the Companies prepared in accordance with GAAP." In Section 3.9, JPMorgan represented and warranted that "[t]o JPMorgan's knowledge, no event has occurred or facts exist that may reasonably give rise to, or would serve as a basis for, commencement of any Action by or against any of the Companies or JPMorgan."

90.       JPMorgan breached those representations and warranties by:

    a.  failing to disclose that JPEX clients were in actual receipt of 1031 exchange funds;

    b.  failing to disclose that account structures lacked adequate safeguards to prevent constructive receipt of 1031 exchange funds;

    c.  failing to disclose the substantial risk that JPEX was disqualified as a qualified intermediary due to JPMorgan's provision of non-routine financial services.

91.      In Section 3.10(a) of the Share Purchase Agreement, JPMorgan represented and warranted that JPEX and JPMorgan "have each complied and are in compliance in all material respects with all Laws applicable to them and the Business, and to JPMorgan's knowledge no material violations of Law exist[]."  It further represented and warranted that "no reasonable basis or bases exists for any threatened investigation or disciplinary proceeding against any of the Companies relating to the Business that could lead to an order or action suspending, restricting, or disqualifying the continued performance of the Business in any material respect."

92.      JPMorgan breached these representations and warranties by:

    a.  failing to disclose that JPEX had not complied with tax laws and regulations by permitting actual or constructive receipt of exchange funds;

    b.  failing to disclose that there existed a reasonable basis for a threatened investigation or disciplinary proceeding relating to JPEX's potential disqualification as a qualified intermediary based on JPMorgan's provision of non-routine financial services.

93.     NESF suffered harm from JPMorgan's breaches in a number of ways, all of which were reasonably foreseeable to JPMorgan, including:

    a.  paying $8 million and investing an additional $4 million of borrowed funds into a business that, because of its billions of dollars of potential tax liabilities, actually had a very large negative value;

    b.  paying more than $2.1 million in fees and interest in connection with the transaction and the loan used to finance the acquisition;

    c.  suffering a reduction in the value of its business and/or lost profits of at least $43 million;

    d.  suffering other significant damages to be proved at trial.

94.     In addition, in Section 5.2(a) of the Share Purchase Agreement, JPMorgan agreed to "use commercially reasonable efforts to take, or cause to be taken, all actions, and do, or cause to be done, and to assist and cooperate with the other party or parties in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated hereby."  Section 5.10 further required JPMorgan to resign as agent, holder, or trustee of any escrow or similar account within five days of NESF's demand and to "provide commercially reasonabl[e] cooperation to [NESF] . . . for the transfer of Client Assets" to any successor.

95.     JPMorgan breached those provisions by failing to use commercially reasonable efforts to assist in promptly transferring exchange accounts to NESF's banks.  Those failures included, among other things:

    a.  making false representations to Client G in order to persuade it to remain at JPMorgan;

    b.   advising Client B that it was making an exception to prevent the transfer of Client B's accounts;

    c.   unreasonably delaying the issuance of its resignation notices and otherwise failing to assist in the transfer of client accounts.

96.      NESF suffered harm from each of JPMorgan's breaches set forth above in a number of ways, all of which were reasonably foreseeable to JPMorgan, including:

    a.   losing millions of dollars in revenue from JPMorgan's interference, delay, and failure to provide commercially reasonable assistance, including substantial delays in transferring the Client G account and complete loss of the Client B account;

    b.   paying waiver fees and penalty interest on its loan; failing to obtain equity financing; and suffering diminished business value and lost profits as a result of the foregoing.

97.      In Section 2.3(e) of the Share Purchase Agreement, JPMorgan agreed to make true-up payments of up to 75 basis points for six months for accounts not yet transferred. JPMorgan breached that provision by refusing to pay any true-up amount for the $178 million deposit by Client G.

98.      JPMorgan also agreed to reimburse NESF for the year-end bonuses of JPEX employees who became NESF employees after the acquisition.  JPMorgan breached that agreement by failing to reimburse NESF for the $97,000 bonus that JPMorgan promised to Pat McCloskey, which NESF paid.

## COUNT II: FRAUD

99.     NESF re-alleges and incorporates herein the allegations in Paragraphs 1-98 above.

100.    JPMorgan, through the conduct of its employees acting within the scope of their employment, made the following representations to NESF:

    a.  that JPEX was free of potential liabilities;

    b.  that JPMorgan knew of no basis for litigation against JPEX;

    c.  that JPEX was in compliance with all applicable laws and regulations;

    d.  that there was no basis for believing that JPEX would be disqualified from the business of 1031 exchanges; and

    e.  that the majority of JPEX's new clients were not JPMorgan referrals but instead represented leads independently generated by JPEX.

101.    Each of those representations was false, and JPMorgan knew each representation to be false.

102.    JPMorgan made each misrepresentation with the intent that NESF rely on it in deciding to purchase JPEX and in valuing the JPEX shares.

103.    NESF was justified in its reliance on JPMorgan's misrepresentations.

104.    NESF was damaged by JPMorgan's misrepresentations in the following ways, each of which was reasonably foreseeable to JPMorgan:

    a.  paying $8 million and investing an additional $4 million of borrowed funds into a business that, because of its billions of dollars of potential tax liabilities, actually had a very large negative value;

    b.  paying more than $2.1 million in fees and interest in connection with the

        transaction and the loan used to finance the acquisition;

    c.  suffering a reduction in the value of its business and/or lost profits of at

        least $43 million;

    d.  suffering other significant damages to be proved at trial.

### COUNT III:  TORTIOUS INTERFERENCE WITH
### PROSPECTIVE BUSINESS RELATIONS

105.      NESF re-alleges and incorporates herein the allegations in Paragraphs 1-104 above.

106.      In purchasing JPEX, NESF reasonably anticipated entering into business relationships with former JPEX clients in which the clients would maintain exchange funds at banks with which NESF had relationships.

107.      JPMorgan knew of those prospective business relationships.

108.      JPMorgan engaged in intentional and wrongful acts for the purpose of interfering with NESF's prospective business relationships with former JPEX clients.  Those acts included, among other things:

    a.  making false representations to Client G in order to persuade it to remain

        at JPMorgan;

    b.  advising Client B that it was making an exception to prevent the transfer

        of Client B's accounts;

    c.  unreasonably delaying the issuance of its resignation notices and otherwise failing to assist in the transfer of client accounts.

109.      JPMorgan's conduct was a substantial factor in delaying or preventing the formation of NESF's prospective business relationships.

110.       NESF suffered harm as a result of JPMorgan's conduct set forth above in a number of ways, all of which were reasonably foreseeable to JPMorgan, including:

     a.  losing millions of dollars in revenue from JPMorgan's interference and misrepresentations, including substantial delays in transferring the Client G account and complete loss of the Client B account;

     b.  paying waiver fees and penalty interest on its loan; failing to obtain equity financing; and suffering diminished business value and lost profits as a result of the foregoing.

### COUNT IV: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

111.       NESF re-alleges and incorporates herein the allegations in Paragraphs 1-110 above.

112.       JPMorgan has acted in a manner that has had the effect of destroying or injuring NESF's right to receive the benefits of the Share Purchase Agreement by, among other things:

     a.  making false representations to Client G in order to persuade it to remain at JPMorgan;

     b.  advising Client B that it was making an exception to prevent the transfer of Client B's accounts;

     c.  unreasonably delaying the issuance of its resignation notices and otherwise failing to assist in the transfer of client accounts.

113.       NESF was reasonably justified in understanding those benefits to have been included in the acquisition.

114.    NESF suffered harm from each of JPMorgan's breaches set forth above in a number of ways, all of which were reasonably foreseeable to JPMorgan, including:

    a.  losing millions of dollars in revenue from JPMorgan's interference, delay, and failure to provide commercially reasonable assistance, including substantial delays in transferring the Client G account and complete loss of the Client B account;

    b.  paying waiver fees and penalty interest on its loan; failing to obtain equity financing; and suffering diminished business value and lost profits as a result of the foregoing.

## COUNT V: INDEMNIFICATION

115.    NESF re-alleges and incorporates herein the allegations in Paragraphs 1-114 above.

116.    Under Section 8.1 of the Share Purchase Agreement, JPMorgan agreed to indemnify NESF from and against any and all "Liabilities arising out of or caused by, directly or indirectly" any "material breach of the representations of warranties" or "any material failure by JPMorgan to satisfy or perform any covenant, agreement or term of this Agreement." "Liabilities" is defined in Section 1.1 to include liabilities that are "known or unknown, absolute or contingent, liquidated or unliquidated, due or to become due, accrued or not accrued, asserted or unasserted or otherwise."

117.    NESF has incurred substantial Liabilities, as defined by the agreement, due to the actual receipt, constructive receipt, and disqualification issues set forth above.

118.    NESF is entitled to indemnification for those Liabilities, even though they may presently be contingent or unasserted.

119.     NESF demands indemnification in the total amount of the JPEX clients' potential liabilities for all tax deficiencies, penalties, and interest resulting from the foregoing violations.

WHEREFORE, plaintiff NES Financial Corp. requests that this Court enter judgment against defendant as follows:

(a)     awarding damages in an amount to be proved at trial, but in excess of $75,000;

(b)     awarding attorney's fees, prejudgment interest, and costs incurred by NESF in connection with this action;

(c)     awarding punitive damages;

(d)     granting such other and further relief as this Court deems just and proper.

Dated: May 19, 2011                          Respectfully submitted,

                                             Steven F. Molo (SM-1818)
                                             Robert K. Kry (RK-0929)
                                             MOLO LAMKEN LLP
                                             540 Madison Avenue
                                             New York, NY 10022
                                             (212) 607-8160 (telephone)
                                             (212) 607-8161 (facsimile)